# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| Terrance Morris, et al., | ) |
| Plaintiffs, | ) |
| vs. | ) No. 05-0362-CV-W-FJG |
| Jarrett Lanpher, et al., | ) |
| Defendants. | ) |

# ORDER

Pending before the Court is Defendants' motion for summary judgment and suggestions in support (Doc. No. 52).

## I.  Background

Plaintiffs are Terrance Morris, Ricardo Morris and Rosalind Morris[1], a family who at the time of the incidents described in Plaintiffs' complaint resided in a home at 1318 East 62nd Street, Kansas City, Missouri. On July 28, 2003, two assailants shot a resident of a home at 6206 Paseo, Kansas City, Missouri, near Plaintiffs' residence. On July 30, 2003, Defendant Jarrett Lanpher, obtained a search warrant for Plaintiffs' home in connection with the July 28, 2003, shooting. On July 30, 2003, after the warrant was issued, a Tactical Entry Team was assembled to execute the warrant. This team included Defendant Mark Hockemeier, Defendant Anthony Hernandez, and Defendant Ryan Bronner. Ten seconds after Defendants knocked on the door and received no reply, the door was knocked in, and Plaintiff Terrance Morris was told to get down on the ground. In the process of the execution of the search warrant, Plaintiff Terrance Morris was kicked in the face by Defendant Hockemeier. Following the execution of the search warrant, no charges were brought against any of the Plaintiffs in relation to the July 28, 2003, shooting.

Plaintiffs bring seven counts in their complaint: Count I against Defendant Lanpher for Illegal Affidavit/Application for Search Warrant and Resulting Deprivation of Right,

---

[1]Rosalind Morris is the mother of Terrance and Ricardo.

Cognizable under 42 U.S.C. § 1983; Count II against Defendant Schweitzer for Failure to Supervise Defendant Lanpher and Resulting Deprivation of Right, Cognizable under 42 U.S.C. § 1983; Count III against Defendants Hockemeier, Hernandez, and Bronner for Illegal Execution of Search Warrant and Resulting Deprivation of Right, Cognizable under 42 U.S.C. § 1983; Count IV against Defendant Hockemeier for Illegal Excessive Force and Resulting Deprivation of Right, Cognizable Under 42 U.S.C. § 1983[2]; Count V against Defendant Hockemeier for Battery[3]; Count VI against Defendant Board for Unconstitutional Municipal Customs, Policies, Practices, and Usages and Resulting Deprivation of Right, Cognizable Under 42 U.S.C. § 1983; and Count VII against Defendant Board for Inadequate Training and Inadequate Supervision of KCPD Officers and Resulting Deprivation of Right, Cognizable under 42 U.S.C. § 1983.

**II.    Facts**

Plaintiffs Terrance, Ricardo and Rosalind Morris are residents of Kansas City, Missouri, and at all times relevant to this lawsuit resided at 1318 East 62nd Street.[4] "Dink" and "Mont" are the lifelong nicknames of Ricardo and Terrance Morris, respectively. Defendants Detective Lanpher, Sergeant Schweitzer, Sergeant Hockemeier, Police Officer Hernandez and Police Officer Bronner are employees of the Kansas City, Missouri, Board

---

[2]In Plaintiffs' complaint, Plaintiffs characterize this claim as one of <u>all</u> Plaintiffs against Defendant Hockemeier. However, it is clear from the pleadings and the evidence presented on summary judgment that only one of the plaintiffs has a claim against Defendant Hockemeier for these allegations: Plaintiff Terrance Morris, who was allegedly kicked in the mouth and/or face during the execution of the search warrant.

[3]Again, although the complaint alleges that all Plaintiffs have a claim against Hockemeier for battery, only Plaintiff Terrance Morris actually states a claim.

[4]Plaintiffs include additional facts relating to themselves; however, the Court finds these facts are not material to the issues presented in this motion. For instance, Plaintiffs state that (1) they have a "reputation in the community as responsible, law abiding, and gainfully employed citizens," citing only their own testimony (<u>see</u> ¶ 30 of Doc. No. 64); and (2) they have never had any involvement with serious criminal activity (<u>see</u> <u>id.</u>, ¶ 31).

2

Case 4:05-cv-00362-FJG   Document 90   Filed 03/20/07   Page 2 of 17

of Police Commissioners.

On July 28, 2003, police officers from the Kansas City Missouri Police Department were dispatched to 6206 Paseo in regards to the report of a shooting. When officers located the shooting victim, the victim stated that two black males confronted him in his kitchen and these men shot at the victim several times, wounding him.

Detective Lanpher investigated the shooting at 6206 Paseo.[5] On July 29, 2003, Detective Lanpher interviewed the victim at Research Medical Center.[6] According to the written interview summary of Detective Lanpher, the victim recalled the attack by first describing "two black males" as the assailants, and also described his efforts to summon help by making noise and calling out after he had retreated to the basement of the house, and that, at one point, one attacker came to a broken basement window and threatened to try harder to kill the victim, but only if he continued to make loud noise. Additionally, during that interview, the victim was asked if he knew of anyone who would have done this

---

[5] Plaintiffs include several additional facts regarding the search of the victim's residence made on July 29, 2003, including information that at the victim's house were found guns, ammunition, scales, white residue, green leafy substance, a hot tub room, an in-wall aquarium, a Jacuzzi tub, and an air-conditioning unit with severed wires and pipes. See Doc. No. 64, ¶¶ 35-39. The Court finds that the contents of the shooting victim's residence are of only marginal relevance to the issues presented in Defendants' motion. Plaintiffs further note that the investigation had also focused on the victim's roommate, Jason Lancaster (a white male), and that Lancaster led police on a high speed pursuit through several neighborhoods in Kansas City on July 29, 2003. See Doc. No. 64, ¶¶41-45. Again, however, this is of only marginal relevance, as Defendants admit that the victim told Detective Lanpher that he believed his roommate was involved but that other individuals did the actual shooting.

[6] In Plaintiffs' statement of facts, Plaintiffs argue that the interview occurred less than 24 hours after the victim "sustained the gunshot wounds, underwent emergency surgery and received anesthesia for the same; had very likely received significant amounts of medication for the alleviation of pain; and was also likely suffering from the mind-altering effects of recent and long term abuse of illegal drugs." As noted by Defendants, however, there is no evidence in the record that the victim underwent emergency surgery, received anesthesia, received significant amounts of pain medication, or was "suffering from the mind-altering effects of recent and long term abuse of illegal drugs." Plaintiffs' argument, therefore, will be disregarded.

3

to him and indicated that he believed his roommate was somehow involved but that two individuals who associated with his roommate were the ones who did the actual shooting. Exhibit 3 to Doc. No. 52, Investigative Report dated July 30, 2003.[7] The victim told Detective Lanpher that the he only knew the individuals who shot him as "Dink" and "Mont," but he would be able to identify the individuals who attacked him. Id.

After confirming the identities of "Dink" and "Mont" as Terrance and Ricardo Morris, Detective Lanpher returned to the Research Medical Center and presented the victim with a photograph lineup consisting of six black males all similar in appearance. One of the pictures was of Ricardo Morris.[8] Id. The victim identified Ricardo Morris as one of the persons who shot him. Id. Based on the information received from the investigation,

---

[7]Plaintiffs argue that the detective's unsworn attributions to the shooting victim are in some unspecified way not in compliance with Rule 56 of the Federal Rules of Civil Procedure. However, as noted by Defendants in their reply, Detective Lanpher's report is a business record admissible pursuant to Rule 803(8) of the Federal Rules of Evidence, and further noting that the parties have stipulated to the authenticity of this exhibit. Doc. No. 58, ¶ 24. Furthermore, although Plaintiffs attempt to argue that Detective Lanpher made false representations in order to obtain the search warrant, the Court agrees with Defendants that the assertions made by Plaintiffs in this regard are speculation and argument that are not supported by the evidence. In particular, the actual content of the deposition transcripts cited by Plaintiffs do not provide support for Plaintiffs' assertions at all, and appear to be Plaintiffs' argumentative interpretation of Detective Lanpher's answers to Plaintiffs' counsel's oftentimes improper questions. To the extent that Plaintiffs' "facts" are in actuality argument, the Court will disregard the same in the remainder of its recitation of the facts.

[8]Plaintiffs state that it is undisputed that Defendant Lanpher presented a photograph lineup; however, Plaintiffs dispute that the photographic lineup referenced was proper because it was the same photographic lineup presented to the shooting victim's roommate Jason Lancaster the night before, as evidenced by the fact that his initials are on the back of the lineup. See Ex. 28 to Doc. No. 64. Plaintiffs then go on to state (without evidentiary support) that Lancaster's initials appear on the back of the lineup "to bolster the likelihood of the shooting victim making the same identification." See Doc. No. 64, p. 5, ¶ 9. This Court agrees with Defendant that Plaintiffs' suggestion that the photographic lineup was improper is speculation; none of the evidence presented suggests that the photographic lineup was improper or that the shooting victim was shown the back of the lineup prior to the selection of the photograph of Ricardo Morris.

4

Detective Lanpher submitted an application for a warrant to search the residence of Terrance and Ricardo Morris.[9] Exhibit 1 to Doc. No. 52. On July 30, 2003, a judge for the Circuit Court of Jackson County, Missouri, signed a search warrant for the Morris home to search and seize "Clothing, handguns, rifles, ammunition, spent shell casings, trace evidence, flashlights."[10] Exhibit 2 to Doc. No. 52.

On July 30, 2003, officers of the Tactical Entry Team (also known as the 630 Squad) for the Kansas City Missouri Police Department executed the search warrant on the Morris residence. Defendants Hernandez, Bronner and Hockemeier were all members of that Tactical Entry Team that executed the warrant on the Morris residence. Prior to executing the warrant, the members of the Tactical Entry Team were briefed by Detective Lanpher regarding the investigation and reviewed the warrant to make sure the information on the warrant was accurate. After approaching the residence, Officer Hernandez knocked on the Morris's front door and announced "Police Officers, Search Warrant" and then in a loud

---

[9] Plaintiffs identify additional facts they believe were relevant toward the warrant application: (1) the victim stated that his roommate, Lancaster, "hung with some dudes around the corner on East 62nd in a red brick house," and the Morris home is neither red nor brick; (2) the victim stated he did not know anything about assault rifles being in his home; (3) Detective Lanpher purportedly did a computer check of Terrance and Ricardo, and that check would have made it plainly obvious that neither have a history of prior similar bad acts; and (4) Detective Lanpher interviewed Lancaster on July 29, 2003, and Lancaster told him that (a) someone named Fuzzy was having problems with the victim, (b) Lancaster had visited the victim at the hospital earlier on July 29, 2003, and (c) the victim described his assailants to Lancaster as "one of them stocky and the other a short dude," whereas Detective Lanpher had information in his case file that both Terrance and Ricardo were over six feet tall and less than 170 pounds. See Doc. No. 64, ¶¶ 48-57. However, as noted by Defendants, there is no evidence that the shooting victim told Lanpher that the attackers lived at a red brick house, nor is there any evidence that Lanpher did a computer check of Terrance and Ricardo. Further, the victim's statement regarding the assault rifles is of little relevance to the making of the warrant application, and the statements of Lancaster (another suspect in the shooting) did not preclude a finding of probable cause as to Terrance and Ricardo.

[10] Plaintiffs note that no such evidence was found. See July 30, 2003, Search Warrant and Return, Ex. 19 to Doc. No. 64.

5

voice counted out loud ten seconds. No one responded to the door before the conclusion of the ten second count. After ten seconds, Police Officer Bronner used a battering ram to breach the Morris' front door. Upon entering the home, the Tactical Entry Team encountered Terrance Morris in the kitchen area. Police Officer Hernandez instructed Terrance Morris to show the officers his hands and to get down on the ground. Officer Hernandez testified that Terrance Morris did not comply with his instructions and Police Officer Hernandez forced Terrance Morris onto the floor. Hernandez Depo., 13:4-12, Ex. 5 to Doc. No. 52.[11]

At some point in time during the search of the residence, Defendant Hockemeier encountered Plaintiff Terrance Morris and kicked him in the mouth. Defendant Hockemeier indicates that Terrance Morris disobeyed verbal directives given to him, and Hockemeier kicked him in order to secure Terrance Morris's compliance with verbal commands. Plaintiff Terrance Morris disputes that he disobeyed the officer's directives, and disputes Defendant Hockemeier's rationale for the kick in the mouth. Terrance Morris suffered cuts to his mouth, including one cut on the inside of his lip and another on the outside of his mouth, near his chin. Defendants assert that Terrance Morris refused medical treatment at the scene. Depo. of Terrance Morris, 30:24 - 31:4, Ex. 6 to Doc. No. 52 ("Q: After you were on the couch, what happened next? A: They wanted me to get medical attention, but I told them no. I resisted. I didn't want to go. I wanted to know what was going on.") Plaintiffs, however, dispute that Terrance Morris refused medical treatment at the scene, noting that the injury to his mouth was treated by paramedics that were called to the scene. See id.,

---

[11]Plaintiffs attempt to dispute that Terrance Morris did not comply with Police Officer Hernandez's instructions; however, in their attempt to do so, Plaintiffs simply argue that they "had no involvement with the crime being investigated," which is not relevant as to whether Terrance Morris complied with instructions. Plaintiffs do not dispute that Officer Hernandez forced Terrance Morris onto the ground.

6

31:12-32:3.[12]

Ms. Morris, Terrance, and Ricardo reported the incident to the Defendant Board by filing a complaint with its Office of Citizen Complaints (hereinafter, "OCC") in the days immediately following the execution of the search warrant. Rosalind Morris testified at her deposition that she desired the investigation evaluate how the warrant could be issued as to her home, in addition to evaluating the claim of excessive force. Doc. No. 64, Rosalind Morris Deposition, 79:1-80:25. The OCC directed the KCPD Internal Affairs unit to investigate the use of force by Defendant Hockemeier.[13] See Doc. No. 64, Ex. 42 I. The official finding in regards to Officer Hockemeier's use of force was that the complaint was unsubstantiated because, "It is unknown if the force used on Mr. Morris was reasonable given the circumstances. Without videotape of the incident or other officers or citizens who witnessed the kick, it cannot be determined if that action was appropriate given the nature of the incident."[14] Id.

---

[12] Defendants further assert that Terrance Morris never received any additional medical treatment for his wound, citing "Exhibit 7, Sworn Statement of Terrance Morris of August 26, 2003, at pg. 4." Notably, Exhibit 7 is not attached to Defendants' motion. Further, Plaintiffs dispute this fact, noting that Plaintiff Terrance Morris received medical treatment at Research Medical Center on one occasion after the incident. See Terrance Morris Deposition, Ex. to Doc. No. 64, 53:22 - 55:25; Terrance Morris's Medical Records, Ex. 1 to Doc. No. 64.

[13] Plaintiffs assert that the OCC "ignored all other aspects of the complaint." See Doc. No. 64, ¶ 85. However, there is no evidence before the Court as to the actual contents of Plaintiffs' complaint; the only evidence is what Plaintiff Rosalind Morris believed the OCC and KCPD Internal Affairs unit would investigate.

[14] Plaintiffs argue that the complaint "was not investigated to a reasonable standard of care." See Doc. No. 64, Declaration of D. P. Van Blaricom. However, this is not a fact, but instead is a conclusion of law that will not be considered on summary judgment. Plaintiffs further state, "None of the investigators was able to figure out that a police officer should not use a steel-toed boot to attempt a brachial stun, and the lack of knowledge regarding precautions during the use of nerve receptor techniques is widespread and pervasive in the Kansas City, Missouri, Police Department." However, as noted by Defendants, there is no evidence to support Plaintiffs' argument that the use of steel toed shoes to effectuate a nerve receptor technique is either widespread or

7

The investigation as to who shot the victim was officially inactivated in October of 2003 after the victim refused to cooperate with police.[15] See Doc. No. 64, Ex. 13.

## III. Summary Judgment Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. Id. Rather, "the disputes must be outcome determinative under prevailing law." Id. (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is

---

pervasive.

[15] Plaintiffs further claim that Defendant Lanpher never went back to the hospital to tell the victim that the persons he identified as attacking him "were instantly cleared of suspicion." See Doc. No. 64, ¶ 90. However, even assuming this is true, Plaintiffs do not demonstrate that Detective Lanpher's alleged failure in this regard constitutes a breach of any duty he owed the Plaintiffs.

some metaphysical doubt as to the facts." Matsushita, 475 U.S. at 586. Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.

**IV. Analysis**

    A.    Count I: Plaintiffs' Allegations Against Defendant Lanpher for Illegal Affidavit/Application for Search Warrant and Resulting Deprivation of Right, Cognizable under 42 U.S.C. § 1983

Defendant Lanpher argues that qualified immunity prevents Plaintiffs' case against him from proceeding to trial. Plaintiffs must demonstrate the following in order for their claims to survive a qualified immunity inquiry: (1) the defendant violated their Constitutional or statutory rights; (2) the right(s) were clearly established at the time of the defendant's alleged conduct; and (3) when viewing the facts in the light most favorable to the plaintiffs, there are genuine issues of material fact as to whether "a reasonable official would have known that the alleged action indeed violated that right." Hunter v. Namanny, 219 F.3d 825, 829 (8th Cir. 2000). Here, Defendants challenge the first element mentioned above.

With respect to a violation of Plaintiffs' constitutional rights, Plaintiffs allege that Defendant Lanpher illegally obtained a search warrant to their home, in violation of their Fourth Amendment rights. Fourth Amendment protections require that a warrant be based on a truthful showing of facts sufficient to establish probable cause. Franks v. Delaware, 438 U.S. 154, 164-165 (1978). "Truthful" means only "that the information put forth is believed or appropriately accepted by the affiant as true." Id.

Here, Plaintiffs argue that Defendant Lanpher deliberately omitted material and exculpatory information and included falsehoods the warrant affidavit/application to search the Plaintiffs' home. See Doc. No. 64, pp. 24-26. (At Doc. No. 64, pp. 24-26, Plaintiffs

9

argue that the following information was omitted: (1) the victim "admitted" he did not know any of the Morris family other than hearing the two nicknames; (2) the victim claimed the shooters "lived in" a red brick house; (3) the victim's house contained firearms and evidence of drug dealing; (4) the victim's roommate fled from police the day after the shooting; (5) the victim's roommate told police that victim had a rival named "Fuzzy"; (6) Defendant Lanpher wrongly relied on a neighbor, who claimed the victim and the Plaintiff brothers were "great friends and business associates"; (7) Defendant Lanpher's files indicate [based on the roommate's statement] that one of the shooters was short and the other was stocky, however both Ricardo and Terrence are "over 6 feet tall and slight in build"; and (8) the photo line-up presented to the victim was pre-marked with identifications by others. Plaintiffs also allege that Defendant Lanpher's search warrant affidavit/application contained deliberate falsehoods, including (1) Defendant Lanpher's claim that the victim identified the shooters before Defendant Lanpher interviewed a "neighbor minutes after the shooting"; and (2) Defendant Lanpher's claim that neighbors indicated an association between the victim's roommate Jason Lancaster and the Plaintiffs Ricardo and Terrance Morris.)

The Court finds, however, that most of the alleged omissions and falsehoods discussed by Plaintiffs are either immaterial, not supported by the record, or merely conclusions or attorney argument. Whatever the victim's level of knowledge regarding the Morris family, the victim identified the suspects as "Dink" and "Mont"—the undisputed nicknames of Plaintiffs Ricardo and Terrance Morris. The materials found in the victim's home do not automatically cast doubt as to the victim's identification of suspects. Plaintiffs' claims that Defendant Lanpher made false claims regarding what neighbors told him are merely conclusions that are unsupported by any facts in the record. Furthermore, the victim did not claim that the two shooters <u>lived in</u> a red brick house, rather the evidence is that they hung out in a red brick house. Furthermore, the omissions of the victim's

10

roommate's activities and statements are largely immaterial in that the roommate was also a suspect in the shooting, and the roommate's statements do not prevent suspicion of the Morris brothers, given the victim's identification of them. Plaintiffs' allegation that the photo line-up was pre-marked does not demonstrate an omission or falsehood in that there is no evidence that the victim was given the opportunity to view the pre-marked identification on the back of the line-up prior to making his own identification.

The Court agrees with Defendant Lanpher that the facts presented in the application for search warrant sufficiently demonstrated probable cause. The shooting victim said that "Dink" and "Mont" were the shooters, and the shooting victim identified one of his shooters as Plaintiff Ricardo Morris in a photo line-up. The shooting victim said that he believed his roommate Jason Lancaster, "Dink," and "Mont" were involved in his shooting. "Dink" and "Mont" are the lifelong nicknames of Plaintiffs Ricardo and Terrance. The Plaintiffs do not dispute that the victim identified Plaintiffs Terrance and Ricardo Morris as his shooters by their nicknames. Nor do they dispute that the victim identified Plaintiff Ricardo by a photo line-up as one of his shooters. Summary judgment is appropriate if there is <u>any</u> reasonable basis to conclude that probable cause existed. <u>Cross v. City of Des Moines</u>, 965 F.2d 629, 632 (8th Cir. 1992). Furthermore, qualified immunity is only lost where the warrant application is so lacking an indicia of probable cause as to render official belief in its existence unreasonable. <u>George v. City of St. Louis</u>, 26 F.3d 55, 57 (8th Cir. 1994). This Court agrees with Defendants that there is no support for Plaintiffs' claim that an officer's reliance on the accounts of events and identification of suspects by the victim of a crime (absent a reason to believe the victim was mistaken or lying) could ever be the basis for an unreasonable belief on the part of the officer that probable cause existed.

Accordingly, the Court finds that Defendants' motion for summary judgment as to Count I of Plaintiffs' complaint should be **GRANTED.**

  B. Count II: Plaintiffs' Allegations Against Defendant Schweitzer for Failure to Supervise Defendant Lanpher and Resulting Deprivation of Right, Cognizable

under 42 U.S.C. § 1983

Plaintiffs claim that Defendant Schweitzer, as Defendant Lanpher's immediate supervisor, should be held liable for failure to appropriately supervise him in the making of the affidavit/application for the search warrant. However, as noted by Defendants, if the claim against Defendant Lanpher do not survive summary judgment, the claims against Defendant Schweitzer fail as a matter of law. See Schulz v. Long, 44 F.3d 643, 650 (8th Cir. 1995).

Accordingly, as Plaintiffs' claims against Defendant Lanpher for improper application for a search warrant fail for the reasons stated above, Defendants' motion for summary judgment as to Count II of Plaintiffs' complaint is **GRANTED.**

C. Count III: Plaintiffs' Allegations Against Defendants Hockemeier, Hernandez, and Bronner for Illegal Execution of Search Warrant and Resulting Deprivation of Right, Cognizable under 42 U.S.C. § 1983

In Count III, the Plaintiffs contend that Defendants Sergeant Hockemeier, Officer Hernandez, and Officer Bronner violated their Fourth and Fourteenth Amendment rights by illegally executing a search warrant of their home. See Doc. No. 1, p. 26., ¶ 119. The Plaintiffs claim the search warrant execution was unreasonable because the officers only waited ten seconds, after announcing themselves, before breaking in the front door. Doc. No. 1 at p. 26, ¶¶ 120-21.

The knock and announce rule generally requires police officers to "wait[] long enough after knocking to infer that they have been constructively denied admittance." U.S. v. Vesey, 338 F.3d 913, 915 (8th Cir. 2003). The reasonable delay required by the knock and announce rule before officers force entry is determined by the circumstances of each search. United States v. Lucht, 18 F.3d 541, 549 (8th Cir.1994).

12

Defendants point out that the Eighth Circuit has repeatedly held that ten seconds is a sufficient amount of time before forcing entry. U.S. v. Morris, 436 F.3d 1045, 1049 (8th Cir. 2006) (finding ten seconds sufficient where the home to be searched was modestly sized, the occupants were probably awake, and the risk of evidence destruction was high); Vesey, 338 F.3d at 916 (finding ten seconds sufficient before entering a small apartment to search for drugs). Plaintiffs do not dispute the Defendants' contention that Eighth Circuit case law suggests that a ten second delay, when investigating a violent crime, is sufficient under the knock and announce rule. Further, Plaintiffs "concede that summary judgment could be granted on Count III." Doc. No. 64, p. 28, ¶ 2.

Accordingly, as it is undisputed that Defendants waited ten seconds before entering and as Plaintiffs have conceded summary judgment is appropriate in this circumstance, Defendants' motion for summary judgment is **GRANTED** as to Count III of Plaintiffs' complaint.

   D.   Count IV: Plaintiff Terrance Morris's Allegations Against Defendant Hockemeier for Illegal Excessive Force and Resulting Deprivation of Right, Cognizable Under 42 U.S.C. § 1983

After considering Defendants' motion and suggestions in support (Doc. No. 52), Plaintiffs' suggestions in opposition (Doc. No. 64), and Defendants' reply (Doc. No. 65), the Court finds that genuine issues of fact remain as to Plaintiff Terrance Morris's claim against Defendant Hockemeier for excessive force. Therefore, Defendants' motion for summary judgment as to Count IV of Plaintiffs' complaint will be **DENIED.**

   E.   Count V: Plaintiff Terrance Morris's Allegations Against Defendant Hockemeier for Battery

Defendants state that Plaintiff Terrance Morris's claim against Defendant

Hockemeier for battery is barred because (1) as discussed in relation to Count IV, Defendant Hockemeier's use of force was reasonable; (2) as a government official, Defendant Hockemeier is shielded by the doctrine of official immunity in that his acts toward Plaintiff were discretionary acts; and (3) as Defendant Hockemeier is a public employee, Plaintiff's claims are barred pursuant to the public duty rule.

With respect to whether the use of force was reasonable, the Court finds that genuine issues of fact remain, as discussed in relation to Count IV, above.  Further, this Court finds that issues of fact remain as to whether Defendant Hockemeier acted in bad faith or malice toward Plaintiff Terrance Morris, preventing this Court from granting summary judgment based on the doctrine of official immunity.  See Blue v. Harrah's North Kansas City, LLC, 170 S.W.3d 466, 479-80 (Mo. App. W.D. 2005) (finding that official immunity does not apply to discretionary acts done in bad faith or with malice).  Finally, with respect to the public duty doctrine, which provides that a "public employee may not be held civilly liable for breach of a duty owed to the general public, as distinguished from a duty owed to a particular individual," Green v. Denison, 738, S.W.2d 861, 866 (Mo. banc 1987), Defendants do not identify with particularity the duty allegedly breached, preventing this Court from undertaking an analysis as to whether the duty was owed to the general public or to Plaintiff in particular.[16]  Accordingly, Defendants' motion for summary judgment as to Count V of Plaintiffs' complaint is **DENIED.**

      F.      Count VI: Plaintiffs' Allegations Against Defendant Board for Unconstitutional Municipal Customs, Policies, Practices, and Usages and Resulting Deprivation of Rights, Cognizable Under 42 U.S.C. § 1983

Defendants note that a plaintiff may only establish municipal liability under Section 1983 if the plaintiff demonstrates that his constitutional rights were violated by an "action

---

[16]Further, although Plaintiffs have not provided cases in support of this proposition, the Court finds persuasive for purposes of this motion only Plaintiffs' assertion that since duty is not an element of the intentional tort of battery, the public duty doctrine ought not apply in this situation.

14

pursuant to official municipal policy" or misconduct among non-policymaking employees so pervasive "as to constitute a 'custom or usage' with the force of law." Ware v. Jackson County, Mo., 150 F.3d 873, 880 (8th Cir. 1998)(quoting Monell v. Department of Soc. Serv., 436 U.S. 658, 691 (1978)). "Custom or usage" is demonstrated by (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) proof that the custom was the moving force behind the constitutional violation. Id.

As noted by Defendants, Plaintiffs have presented absolutely no evidence of an official municipal policy. Furthermore, giving full consideration of the arguments made in Plaintiffs' response (Doc. No. 64), Plaintiffs' have failed to demonstrate deliberate indifference by policy-making officials after notice to the officials of similar misconduct. There is simply no evidence in the record that the Board received notice of any relevant misconduct. Under these circumstances, the Defendant Board cannot be found liable. Defendants' motion for summary judgment as to Count VI of Plaintiffs' complaint is **GRANTED.**

      G.    Count VII: Plaintiffs' Allegations Against Defendant Board for Inadequate Training and Inadequate Supervision of KCPD Officers and Resulting Deprivation of Rights, Cognizable under 42 U.S.C. § 1983

As noted by Defendants, in order for the Board to be found liable for inadequate training or supervision, Plaintiffs must demonstrate: (1) the board received notice of a pattern of unconstitutional acts committed by the subordinate(s); (2) defendants demonstrated deliberate indifference to or tacit authorization of the offensive acts; (3) defendants failed to take sufficient remedial action to train or supervise the offending subordinate; and (4) such failure proximately caused injury to the plaintiffs. Owl v. Robertson, 79 F.Supp.2d 1104, 1114 (D. Neb. 2000); Otey v. Marshall, 121 F.3d 1150,

15

1155 (8th Cir. 1997).

Defendants state that Plaintiffs have provided no evidence of a pattern of unconstitutional acts, nor have Plaintiffs provided evidence that the Board knew of any unconstitutional acts (and, thus, the Board could not be deliberately indifferent to or tacitly authorize the same). In response, Plaintiffs simply argue that there must be a failure to train and supervise in regards to the use of force and nerve receptor techniques, given the allegations in Plaintiffs' complaint. However, Plaintiffs have completely failed to point to any evidence that the Board had any <u>notice</u> about a pattern of constitutional violations committed by subordinates. Under these circumstances, the Defendant Board cannot be found liable. Defendants' motion for summary judgment as to Count VII of Plaintiffs' complaint is **GRANTED.**

## V.     Conclusion

Therefore, for all the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 52) is **GRANTED IN PART** as it relates to the claims raised in Counts I, II, III, VI, and VII of Plaintiffs' complaint. Defendants' motion for summary judgment (Doc. No. 52) is **DENIED IN PART** as it relates to the claims raised in Counts IV and V of Plaintiffs' complaint.

The only claims remaining for trial are Plaintiff Terrance Morris's claims against Defendant Mark Hockemeier, as stated in Counts IV and V of Plaintiffs' complaint. Accordingly, as the claims remaining for trial have been limited substantially since the time the parties made their pre-trial filings, the Court finds that the parties should submit revised versions of these documents. Plaintiff's revised witness list, exhibit list, deposition designations, and proposed instructions are due on or before **Friday, March 23, 2007.**

Defendant's revised witness list, exhibit list, objections to plaintiff's deposition designations, and proposed instructions are due on or before **Tuesday, March 27, 2007.**

**IT IS SO ORDERED.**

/s/Fernando J. Gaitan, Jr.
Chief United States District Judge

Dated:   3/20/07
Kansas City, Missouri

17